# EXHIBIT F



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/015,054 | 06/08/2022 | 10698989 | 2090-0003-REX | 1008 |

142179        7590        08/02/2022
Hard IP LLC (General)
10 Notch Hill Drive
Livingston, NJ 07039

| EXAMINER |
|---|
| TON, MY TRANG |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 08/02/2022 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

 **UNITED STATES PATENT AND TRADEMARK OFFICE**

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

MARISSA R. DUCCA (GENERAL)
1300 I STREET NW,
SUITE 900I
WASHINGTON, DC 20005

# *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. *90/015,054* .

PATENT UNDER REEXAMINATION  *10698989* .

ART UNIT *3992* .

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the *ex parte* reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

PTOL-465 (Rev.07-04)

| *Order Granting Request For Ex Parte Reexamination* | Control No. | Patent Under Reexamination |
|---|---|---|
| | 90/015,054 | 10698989 |
| | Examiner | Art Unit | AIA (FITF) Status |
| | MY TRANG TON | 3992 | No |

*--The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

The request for *ex parte* reexamination filed <u>06/08/2022</u> has been considered and a determination has been made. An identification of the claims, the references relied upon, and the rationale supporting the determination are attached.

Attachments:   a)☐   PTO-892,      b)☑   PTO/SB/08,      c)☐   Other: _____

1. ☑   The request for *ex parte* reexamination is GRANTED.

　　　RESPONSE TIMES ARE SET AS FOLLOWS:

For Patent Owner's Statement (Optional):  TWO MONTHS  from the mailing date of this communication (37 CFR 1.530 (b)). **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**

For Requester's Reply (optional): TWO MONTHS from the **date of service** of any timely filed Patent Owner's Statement (37 CFR 1.535). **NO EXTENSION OF THIS TIME PERIOD IS PERMITTED.** If Patent Owner does not file a timely statement under 37 CFR 1.530(b), then no reply by requester is permitted.

cc:Requester ( if third party requester )

U.S. Patent and Trademark Office
PTOL-471G(Rev. 01-13)       **Office Action in *Ex Parte* Reexamination**       Part of Paper No. 20220623

## ORDER GRANTING *EX PARTE* REEXAMINATION

*Ex parte* reexamination has been requested for claims 1-9 of United States Patent No. 10,698,989, entitled "BIOMETRIC PERSONAL DATA KEY (PDK) AUTHENTICATION" (the **"989 Patent"**).  Substantial new questions of patentability ("SNQs") affecting claims 1-9 of the '989 Patent are raised by the request for *ex parte* reexamination filed June 8, 2022 (the **"Request"**). Accordingly, reexamination is **GRANTED**.

### PRIORITY

After careful review of the prosecution history of the '989 Patent, the Examiner finds that the '989 Patent was filed on February 20, 2016 and assigned U.S. Patent Application No. 15/049,060 (the **"060 Application"**).

The '060 Application is a continuation of application No. 14/521,982, filed on Oct. 23, 2014, now Pat. No. 9,298,905, which is a continuation of application No. 13/710,109, filed on Dec. 10, 2012, now Pat. No. 8,886,054, which is a continuation of application No. 11/314,199, filed on Dec. 20, 2005, now Pat. No. 8,352,730, which claims the benefit of a provisional application No. 60/652,765, filed on Feb, 14, 2005, and a provisional application No. 60/637,538, filed on Dec. 20, 2004.

## LITIGATION

After reviewing the Request, performing a litigation search and reviewing the file history of the '989 Patent, Examiner is aware of the following related litigation: IPR2021-01448.

5

## REFERENCES/DOCUMENTS CITED AS RAISING AN SNQ

In the request for reexamination, the Request alleges that the '989 Patent claims 1-9 raise SNQs in light of the following prior art references:

1.  US. Patent No. 7,188,110 ( **Ludtke**")

10
2.  U.S. Patent Publication No. 2003/0196084 ( **Okereke**")

3.  International Publication Number WO 99/56429 ( "**Scott**")

The Examiner notes that the above cited references have been asserted in the Request as providing disclosures and/or teachings relevant to the claims of the '989 Patent.  The Request (including the documents filed with the Request)

15  and the prosecution history of the 989 Patent have been fully considered in the Examiner's determinations and findings discussed below.

The Examiner finds:

20  1/ All of the cited references in the Reuqest (Ludtke, Okereke and Scott) were not of record in the prosecution of the '060 Application.

2/ Scott was used and discussed in the prosecution of IPR2021-01448. However, the Third Party Requester alleges in SNQ 2 that '989 Patent claims are

rendered obvious in light of Ludtke in view of Scott, based on an combination/interpretation other than that was the focus of IPR2021-01448. In other words, Ludtke was not previously combined with Scott during the IPR2021-01448.

5          3/ In the IPR2021-01448 proceeding, the PTAB denied institution. A denial of institution is not considered an earlier concluded proceeding for the purpose of the SNQ analysis. See MPEP § 2242 I.; *Ex parte Finjan Inc.*, Appeal No. 2018-007444 at 7-8 (PTAB Sept. 28, 2018) ("Because no trial was instituted on the inter partes review, there was no "final holding of invalidity"

10 or "concluded examination or review" for SNQ purposes). To the extent Scott was considered in the IPR2021-01448, Scott is nevertheless not "old art" as defined in the MPEP and the PTAB's determinations likewise do not affect the Examiner's SNQ analysis.


15                    **RELEVANT PROSECUTION HISTORY**

          The following are the Examiners' findings of fact related to the prosecution history of the '989 Patent, as evidenced in the documents of record in the prosecution history of the '060 Application:

02/20/2016   Patent Owner filed the '060 Application with one examined
20                claim.

04/05/2016   The original Examiner issued a Non-Final Office action
                (hereinafter the **"April 2016 NF"**) rejected claim 1 on the ground
                of nonstatutory double patenting as being unpatentable over

claim 1 of U.S. Patent No. 8,886,954 and claim 1 of U.S. Patent

No. 8,352,730; rejected claim 1 on the ground of nonstatutory

double patenting as being unpatentable over claim 2 of

copending Application 14/521,982; rejected claim 1 under 35

5              U.S.C §101 because the claimed invention is not directed to

patent eligible subject matter; and rejected claim 1 under pre-

AIA 35 U.S.C. §103(a) as being unpatentable over Hsu et al (U.S

Patent No. 6,041,410) in view of Stanko (U.S. Patent Application

No. 2005/0074126).

10     10/05/2016  Patent Owner filed an Amendment to amended claim 1 and

added new claims 2-20 (hereinafter the **"October 2016**

**Amendment"**) in response to the April 2016 NF.

12/30/2016  The original Examiner issued a Final Office action (hereinafter

the **"December 2016 Final"**) rejected claims 1, 4-7, 9, 14-17 on

15              the ground of nonstatutory double patenting as being

unpatentable over claims 1, 5-6, 9 12 and 24-26 of U.S. Patent

No. 8,886,954; rejected claim 1 over claim 1 of U.S. Patent No.

8,352,730; and rejected claims 1, 4, 6-10, 13-17 and 19-20 of

the instant application over claims 1, 4-7, 9-10, 12-18 of Patent

20              No. 9,298,905 (which was application 14/521,982).

06/30/2017  Patent Owner filed a request for continued examination (herein

after the **"RCE 2017"**) in response to the December 2016 Final.

In this RCE 2017, claims 1, 3, 9, 14 and 15 were amended.

Claim 2 was cancelled. Claim 21 was added.

07/31/2017  The original Examiner issued a Non-Final Office action
(hereinafter the **"July 2017 NF"**) rejected claims 1, 4-7, 9, and

5              14-17 on the ground of nonstatutory double patenting as being
unpatentable over claims 1, 5-6, 9, 12 and 24-26 of U.S. Patent
No. 8,886,954; rejected claim 1 of the application over claim 1 of
US Patent No. 8,352,730; and rejected claims 1, 4, 6-10, 13-17
and 19-20 over claims 1, 4-7, 9-10, and 12-18 of Patent No.

10             9,298,905 (which was application 14,521,982); rejected claims 1
and 3-21 under 35 U.S.C. §101 because the claimed invention is
not directed to patent eligible subject matter; and rejected
claims 1 and 3-21 under pre-AIA 35 U.S.C. 103(a) as being
unpatentable over Hsu et al. (US Patent 6,041,410) and Shreve

15             et al. (US 2002/0109580) and further in view of Flores et al. (US
2004/0022384).

10/31/2017  Patent Owner filed an Amendment to amended claim 1
(hereinafter the **"October 2017 Amendment"**) in response to the
July 2017 NF.

20  01/18/2018  The original Examiner issued a Final Office action (hereinafter
the **"January 2018 Final"**) rejected claims 1, 4-7, 9, and 14-17
on the ground of nonstatutory double patenting as being
unpatentable over claims 1, 5-6, 9, 12 and 24-26 of U.S. Patent

No. 8,886,954; rejected claim 1 over claim 1 of US Patent No.

8,352,730; rejected claims 1, 4, 6-10, 13-17 and 19-20 over

claims 1, 4-7, 9-10, and 12-18 of Patent No. 9,298,905; rejected

claims 1 and 3-21 under 35 U.S.C. §101 because the claimed

5                 invention is not directed to patent eligible subject matter; and

rejected claims 1 and 3-21 under pre-AIA 35 U.S.C. 103(a) as

being unpatentable over Hsu et al. (US Patent 6,041,410),

Shreve et al. (US 2002/0109580) and further in view of Flores et

al. (US 2004/0022384).

10   04/11/2018   Telephone Interview was conducted.

04/18/2018   Patent Owner filed an Amendment (hereinafter the **"April 2018
             Amendment"**) in response to the January 2018 Final.

05/21/2018   The original Examiner issued an Advisory action (hereinafter the
             **"May 2018 Advisory"**).

15   07/18/2018   Patent Owner filed a request for continued examination (herein
             after the **"RCE 2018"**) in response to the May 2018 Advisory.  In
             the RCE 2018, claims 1, 3, 7-9, 14, and 19-21 were amended.

11/15/2018   The original Examiner issued a Non final Office action
             (hereinafter the **"November 2018 NF"**) rejected claims 1, 4-7, 9,
20                 and 14-17 on the ground of nonstatutory double patenting as
             being unpatentable over claims 1, 5-6, 9, 12 and 24-26 of U.S.
             Patent No. 8,886,954; rejected claim 1 over claim 1 of US Patent
             No. 8,352,730;  rejected claims  1, 4, 6-10, 13-17 and 19-20

over claims 1, 4-7, 9-10, and 12-18 of Patent No. 9,298,905;
rejected claims 1, 3-13 and 21 under pre-AIA 35 U.S.C. 102(b)
as being anticipated by WO 01/35334 A1, or, in the alternative,
under pre-AIA 35 U.S.C. 103(a) as obvious over Kenneth; and

5          rejected claims 14-20 under pre-AIA 35 U.S.C. 103(a) as being
unpatentable over Kenneth and in view of Flores et al. (US
2004/0022384 A1).

02/11/2019   Patent Owner filed an amendment to amended claims 1 and 21
in response to the November 2018 NF.

10   06/10/2019   The original Examiner issued a final Office action (hereinafter the
**"June 2019 Final"**) rejected claims 1, 4-7, 9, and 14-17 on the
ground of nonstatutory double patenting as being unpatentable
over claims 1, 5-6, 9, 12 and 24-26 of U.S. Patent No.
8,886,954; rejected claim 1 over claim 1 of US Patent No.

15          8,352,730; rejected claims 1, 4, 6-10, 13-17 and 19-20 over
claims 1, 4-7, 9-10, and 12-18 of Patent No. 9,298,905; rejected
claims 1, 3-13 and 21 under pre-AIA 35 U.S.C. 102(b) as being
anticipated by WO 01/35334 A1, or, in the alternative, under
pre-AIA 35 U.S.C. 103(a) as obvious over Kenneth; and rejected

20          claims 14-20 under pre-AIA 35 U.S.C. 103(a) as being
unpatentable over Kenneth and in view of Flores et al. (US
2004/0022384).

07/31/2019   Telephone Interview was conducted.

08/08/2019  Patent Owner filed an amendment to amended claims 1, 9 and 14

in response to the June 2019 Final.  Terminal Disclaimer was

filed on the same day.

08/22/2019  The original Examiner issued an Advisory action (hereinafter the

5                    **"August 2019 Advisory"**).

08/30/2019  Patent Owner filed a request for continued examination (herein

after the **"RCE 2019"**) in response to the August 2019 Advisory.

10/17/2019  The original Examiner issued a non-final Office action

(hereinafter the **"October 2019 NF"**) rejected claims 1, 3-13 and

10                   21 under pre-AIA 35 U.S.C. 103(a) as being unpatentable over

WO 01/35334 A1) and in view of Wheeler et al. (US

2002/0023217 A1); and rejected claims 14-20 under pre-AIA 35

U.S.C. 103(a) as being unpatentable over Kenneth, Wheeler and

further in view of Flores et al. (US 2004/0022384 A1).

15  01/17/2020  Patent Owner filed an amendment to amended claims 1, 3, 9, 10,

14, 15; and canceled claims 2, 4-6, 11-13, 16-18 in response to

the October 2019 NF.

02/24/2020  Telephone interview was conducted. And at the same day, the

original Examiner issued an Examiner's amendment for claims

20                   1, 3, 9, 10, 14-15, canceled claims 8, 19 (hereinafter "the

**February 2020 Examiner's Amendment"**).  In the February

2020 Examiner's Amendment, independent original claims were

amended as follows:

Claim 1:

    A method comprising:

    receiving, at a smartphone ~~mobile phone~~, an **identification (**ID**)** code from a third-party trusted authority, the ID code uniquely identifying the **smartphone** ~~mobile phone~~ among a plurality of **smartphones** ~~mobile phones~~;

    persistently storing biometric data **and the ID code on the smartphone,** ~~including~~ **wherein the biometric data is** **one selected from a group consisting of** facial recognition**, a fingerprint scan, and a retinal scan** of a legitimate user ~~and the ID code on mobile phone~~;

    receiving, at the **smartphone** ~~mobile phone~~, scan data from a biometric scan using the **smartphone** ~~mobile phone~~;

    comparing, using the **smartphone** ~~mobile phone~~, the scan data to the biometric data;

    determining whether the scan data matches the biometric data; and

    responsive to a determination that the scan data matches the biometric data, wirelessly sending, from the **smartphone** ~~mobile phone~~, the ID code for comparison by the third-party trusted authority against one or more previously registered ID codes maintained by the third-party trusted authority, a transaction being completed responsive to the third-party trusted authority successfully authenticating the ID code**, wherein the transaction being completed includes accessing one or more from a group consisting of a casino machine, a keyless lock, an ATM machine, a web site, a file and a financial account**.

Claim 9:

A **smartphone** ~~mobile phone~~ comprising:

a persistent storage having an input that receives an **identification** (ID) code from a third-party trusted authority, and biometric data, **~~including~~ wherein the biometric data is one selected from a group consisting of** facial recognition**, a fingerprint scan, and a retinal scan,** of a legitimate user, the ID code uniquely identifying the **smartphone** ~~mobile phone~~ among a plurality of **smartphones** ~~mobile phone~~, the persistent storage storing the biometric data and the ID code, the persistent storage having an output configured to provide ~~the~~ **a** first set of biometric data and the ID code for use on the **smartphone** ~~mobile phone~~;

a validation module, coupled to communicate with the persistent storage ~~media~~ to receive the biometric data from the persistent storage, the validation module having a scan pad to capture scan data from a biometric scan, the validation module comparing the scan data to the biometric data to determine whether the scan data matches the biometric data; and

a wireless transceiver that, responsive to a determination that the scan data matches the biometric data, sends the ID code for comparison by the third-party trusted authority against one or more previously registered ID codes maintained by the third-party trusted authority, a transaction being completed responsive to the third-party trusted authority successfully authenticating the ID code**, wherein the transaction being completed includes accessing one or more from a group consisting of a casino machine, a keyless lock, an ATM machine, a web site, a file and a financial account**.

Claim 14:

A system, comprising:

a smartphone that persistently stores biometric data **and an ID code**, ~~including~~ **wherein the biometric data is one selected from a group consisting of** facial recognition**, a fingerprint scan, and a retinal scan data** of a legitimate user, and ~~an~~ the ID code ~~in the smartphone device~~ **is received from a third-party trusted authority,** the ID code uniquely identifying the **smartphone** ~~device~~ among a plurality of **smartphones** ~~devices,~~ the smartphone configured to indicate that a biometric authentication is requested, the smartphone configured to wirelessly send the ID code to the third-party trusted authority for authentication responsive to determining that scan data from a biometric scan performed using the smartphone matches the biometric data ~~including facial recognition~~ of the legitimate user, wherein a transaction is completed responsive to **successful** authentication of the ID code by the third-party trusted authority, **wherein the transaction being completed includes accessing one or more from a group consisting of a casino machine, a keyless lock, an ATM machine, a web site, a file and a financial account**; and

the third-party trusted authority operated by a third party, the third-party trusted authority storing a plurality of legitimate ID codes and authenticating the ID code received based on a comparison of the ID code received and the legitimate ID codes included in the plurality of the legitimate ID codes.

The original examiner in the '060 Application issued a Notice of Allowability allowing claims 1, 3, 7, 9-10, 14-16 and 20 accompanied with an Examiner's

5     statement of reasons for allowance. The Examiner's Statement of Reasons for Allowance stated:

*"The present invention is directed to method, smartphone and system for allowing a user to carry out a transaction after the user has been successfully authenticated using biometric information and ID code. The closest prior arts cited are generally directed to various aspects of allowing user to carry out a transaction after the users have been successfully authenticated using biometric information and ID code. However, none of the cited arts found alone or in combination suggests or teaches the combination of elements recited in the independent claims. For instance, no parts of the cited arts teach or suggest limitations such as persistently storing biometric data of a legitimate user and an ID code on the smartphone, wherein the ID code is received from a third-party trusted authority, the ID code uniquely identifies the smartphone from a plurality of smartphones. Then when the ID code is successfully verified by the third-party trusted authority, allowing the legitimate user to carry out a transaction, wherein the transaction is selected from a group consisting of a casino machine, a keyless lock, an ATM machine, a web site, a file and a financial account.
Therefore, the claims are allowable for the above reason."*

- The Examiner's Statement of Reasons for Allowance

04/07/2020   A corrected Notice of Allowability was mailed.

06/30/2020   The '060 Application issued as the '989 Patent.  Original claims 1, 3, 7, 9, 10, 14-16 and 20 became Patent claims 1-9.

08/26/2021   Petition requesting trial has been filed (IPR2021-01448).

02/28/2022   Request for Trial Denied for IPR2021-01448. The reasons of the denied were *"Thus, Petitioner has not shown sufficiently that Scott and Lapsley teach "receiving, at a smartphone, an identification (ID) code from a third party trusted authority," as recited in claim limitation 1A. Independent claim 5 similarly recites "a persistent storage having an input that receives an identification (ID) code from a third-party trusted authority"; and independent claim 7*

*similarly recites "the ID code is received from a third party trusted*

*authority." (IPR2021-01448, page 21), or "Because Petitioner*

*does not show persuasively that either Scott or Lapsley teaches a*

*"third-party trusted authority," as recited in claim 1…" (IPR2021-*

5        *01448, page 26).*


## SUBSTANTIAL NEW QUESTIONS OF PATENTABILITY

For a SNQ to be present, it is necessary that:

(A) the prior art patents and/or printed publications raise a substantial

10    question of patentability regarding at least one claim, i.e., the teaching of the

(prior art) patents and printed publications is such that a reasonable examiner

would consider the teaching to be important in deciding whether or not the

claim is patentable; and

(B) the same question of patentability as to the claim has not been

15    decided by the Office in a previous examination or pending reexamination of

the patent or in a final holding of invalidity by the Federal Courts in a decision

on the merits involving the claim. See MPEP §2242.

Furthermore, "[i]t must first be demonstrated that a patent or printed

publication that is relied upon in a proposed rejection presents a new, non-

20    cumulative technological teaching that was not previously considered and

discussed on the record during the prosecution of the application that resulted

in the patent for which reexamination is requested, and during the prosecution

of any other prior proceeding involving the patent for which reexamination is

requested.  See MPEP §2216.

     Based on the forgoing summary of the prosecution history of the Patent

claims 1-9 requested for ex parte reexamination,  Examiner finds that the

5    original Examiner allowed the original claims on the basis of the newly added

subject matter as amended in the February 2020 Examiner's Amendment. At

the time of allowance, independent claim 1 was perceived as including

limitation of "*persistently storing biometric data and the ID code on the*

*smartphone, wherein the biometric data is one selected from a group consisting*

10   *of facial recognition, a fingerprint scan, and a retinal scan of a legitimate user*" in

combination with "*responsive to a determination that the scan data matches the*

*biometric data, wirelessly sending, from the smartphone, the ID code for*

*comparison by <u>the third-party trusted authority</u>  … wherein the transaction being*

*completed includes accessing one or more from a group consisting of a casino*

15   *machine, a keyless lock, an ATM machine, a web site, a file and a financial*

*account*"; independent claim 9 was perceived as including limitation "*a*

*persistent storage having an input that receives an identification (ID) code from <u>a</u>*

*<u>third-party trusted authority</u>, and biometric data, wherein the*

*biometric data is one selected from a group consisting of facial recognition, a*

20   *fingerprint scan, and a retinal scan, of a legitimate user, the ID code uniquely*

*identifying the smartphone among a plurality of smartphones…*" in combination

with "*a wireless transceiver  … wherein the transaction being completed includes*

*accessing one or more from a group consisting of a casino machine, a keyless*

*lock, an ATM machine, a web site, a file and a financial account*"; and

independent claim 14 was perceived as including limitation "*a smartphone that*

*persistently stores biometric data and an ID code, wherein the biometric data is*

*one selected from a group consisting of facial recognition, a fingerprint scan, and*

5   *a retinal scan data of a legitimate user, and the ID code is received from <u>a third-</u>*

*<u>party trusted authority</u>, the ID code uniquely identifying the smartphone among a*

*plurality of smartphones*" in combination with "*wherein a transaction is*

*completed responsive to successful authentication of the ID code by the third-*

*party trusted authority, wherein a transaction is completed responsive to*

10   *successful authentication of the ID code by the third-party trusted authority,*

*wherein the transaction being completed includes accessing one or more from a*

*group consisting of a casino machine, a keyless lock, an ATM machine, a web*

*site, a file and a financial account*" and the base patent issued for those

reasons.

15          In view of this findings, Examiner concludes that if the Request presents

a new reference or combination of references that discloses or teaches the

technological features (*i.e.*, the combination of elements specified in the claims)

as noted above as recited in each of Patent Claims 1, 5, and 7 (renumbered

from original claims 1, 9 and 14), then Examiner would find that new reference

20   (or combination of references) would be important.  In particular, an examiner

would find the teachings important because such teachings would be directed

to those technological features for which the claims were allowed.  Thus, the

Control Number: 90/015,054                                                                                Page 17
Art Unit: 3992

new reference or combination of references disclosing these features would

raise SNQ for the respective claims.


### PROPOSED SNQs

5          The Request proposes combinations of references to raise SNQs for

Claims 1-9 of the '989 Patent (Request at pages 19 and 37):


Ground 1 -  The Request submits Ludtke in combination with Okereke

raise SNQs for claims 1-9.

10          Ground 2 –  The Request submits Ludtke in combination with Scott raise

SNQs for claims 1-9.


### DISCUSSION OF PROPOSED SNQS

Ground 1:  Ludtke in combination with Okereke raise SNQs for claims 1-

15   9 (pages 38-69)

The Request submits that Ludtke in combination with Okereke raises

SNQs for claims 1-9.  The Examiner agrees.

Ludtke teaches a method of identifying an authorized user with a

biometric device and enabling the authorized user to access private information

20   comprising **persistently storing biometric data and an ID code on a**

**smartphone** (Ludtke describes in col. 19, lines 35-40 "*the fingerprint data entry*

*process may be performed at least twice, to confirm that the user has entered the*

*correct data (using the correct fingerprint). If confirmation succeeds, the device*

writes the fingerprint image data into write once memory, or other memory that is protected from accidental modification"), **wherein the biometric data is one selected from a group consisting of facial recognition, a finger-print scan, and a retinal scan of a legitimate user** (Ludtke describes in col. 35, lines 60-

5    64 "*The identification by the biometric device may be achieved in a variety of ways, as discussed above. For example, biometric identification, may be, fingerprint, retinal scan, voice, DNA, hand profile, face recognition, etc.*"; and

**responsive to a determination that a scan data matches the biometric data** (Ludtke describes in col. 39, lines 52-59 that "If *a fingerprint*

10    *has been detected, then at 3106 a check is made to see if it matches a stored authorized fingerprint. If a match does not occur, then at 3110 an error message is output and the DW returns to checking to see if a fingerprint has been detected 3104. If the fingerprint does match a stored one, then at 3108 the DW allows access to functions of the DW and access to a selection of codes*"), **wirelessly**

15    **sending** (Ludtke discloses in col. 5, lines 36-44 "*In one embodiment, the transaction device may be configured to closely resemble a standard credit card. More particularly, the card may have a magnetic stripe or a smart card chip that functions similarly to standard credit cards. In addition, the transaction device may contain wireless data communication, data storage and communication*

20    *protocols for selectively communicating with outside devices such as a digital wallet described herein, point of sale (POS) terminal or personal computer (PC) and digital televisions (DTV)*), **from the smartphone** (Ludtke describes in col. 9, lines 39-42 that "*A variety of communication devices may be used, such as the*

*Internet, direct dial-up modem connections, wireless or cellular signals, etc.*"),

**the ID code for comparison by the third-party trusted authority against**

**one or more previously registered ID codes** (Ludtke discloses in col. 6, lines

41-44 "The *transaction device information is provided to the TPCH 110 that then*

5   *indicates to the vendor 125 and the user 120 approval of the transaction to be*

*performed.*"  Therefore, the TPCH 110 includes information that can be

compared with information from the consumer and the consumer's device so

the TPCH 110 can determine whether the consumer 120 is authorized to

complete a transaction with vendor 125) **maintained by the third-party**

10  **trusted authority** (Ludtke describes in col. 6, lines 49-55 "The *TPCH 110*

*maintains a secure database of transaction device information and user*

*information. In one embodiment, the TPCH 110 interfaces to at least one financial*

*processing system 140 to perform associated financial transactions, such as*

*confirming sufficient funds to perform the transaction, and transfers to the*

15  *vendor 125 the fees required to complete the transaction*"), **a transaction being**

**completed responsive to the third-party trusted authority successfully**

**authenticating the ID code** (Ludtke teaches in col. 6, lines 41-44 "The

*transaction device information is provided to the TPCH 110 that then indicates to*

*the vendor 125 and the user 120 approval of the transaction to be performed*"),

20  **wherein the transaction being completed includes accessing one or more**

**from a group consisting of a casino machine, a keyless lock, an ATM**

**machine, a web site, a file and a financial account** (Ludtke teaches in col. 5,

lines 65- col. 6, line 4 "*A variety of user interfaces may be used. In one*

*embodiment, an input device may be incorporated on the transaction device.*

*Alternately or supplementally an input device may be coupled to the transaction*

*device. In one embodiment, an input device may be provided on a digital wallet*

*coupled to a privacy card. User inputs may be provided on the POS terminals*

5 *including a personal POS terminal.*" Since Ludtke describes the transaction

device as including "a digital wallet", a POSITA would recognize as files that

allow a user to digitally store credit card and other payment information and to

make transactions with that card. Moreover, a POSITA would recognize that

giving access to the digital wallet is providing access to a financial account) as

10 called for in claim 1.

Okereke is used as secondary reference to teach storage of secret

information (¶7 and 45) and unique nature of a device ID (¶ 25).

Thus, Ludtke in view of Okereke therefore provides a new technical

teachings that were not present during the original prosecution, and a

15 reasonable examiner would have found Ludtke in view of Okereke important in

considering the patentability of claim 1.  As SNQ is raised.

The teachings of Ludtke in view of Okereke as discussed in the Request

are not cumulative to any written discussion on the record of the teachings of

the prior art, were not previously considered nor addressed during a prior

20 examination, and the same question were not the subject of a final holding of

invalidity in the Federal Courts.

In regard to Patent claims 5 and 7, these claims contain similar

limitation as claim 1.  Thus, Examiner concludes Ludtke in view of Okereke

raise an SNQ for Patent Claims 5 and 7 in the same manner as for Patent
Claim 1.

     In regard to Patent Claims 2-4, 6 and 8-9 such claims are dependent on
Patent Claims 1, 5 and 7.  Furthermore, dependent claims 2-4, 6 and 8-9 are

5  construed to include all the limitations of the independent claims 1, 5 and 7.
Thus, Examiner concludes Ludtke in view of Okereke raise an SNQ for Patent
Claims 2-4, 6 and 8-9 in the same manner as for Patent Claims 1, 5 and 7.


     More particularly, the item matching in pages 38-69 offered by the
Request is deemed plausible to the degree that further consideration is

10  warranted.



     <u>Ground 2</u> -  Ludtke in combination with Scott raise SNQs for claims 1-9
(pages 69-85).

     The Request submits that Ludtke in combination with Scott raises SNQs

15  for claims 1-9.  The Examiner agrees.

     Ludtke teaches a method of identifying an authorized user with a
biometric device and enabling the authorized user to access private information
comprising **persistently storing biometric data and an ID code on a
smartphone** (Ludtke describes in col. 19, lines 35-40 "*the fingerprint data entry*

20  *process may be performed at least twice, to confirm that the user has entered the*
*correct data (using the correct fingerprint). If confirmation succeeds, the device*
*writes the fingerprint image data into write once memory, or other memory that is*

*protected from accidental modification*"), **wherein the biometric data is one**

**selected from a group consisting of facial recognition, a finger-print scan,**

**and a retinal scan of a legitimate user** (Ludtke describes in col. 35, lines 60-

64 "*The identification by the biometric device may be achieved in a variety of*

5    *ways, as discussed above. For example, biometric identification, may be,*

*fingerprint, retinal scan, voice, DNA, hand profile, face recognition, etc.*"; and

**responsive to a determination that a scan data matches the**

**biometric data** (Ludtke describes in col. 39, lines 52-59 that "*If a fingerprint*

*has been detected, then at 3106 a check is made to see if it matches a stored*

10    *authorized fingerprint. If a match does not occur, then at 3110 an error message*

*is output and the DW returns to checking to see if a fingerprint has been detected*

*3104. If the fingerprint does match a stored one, then at 3108 the DW allows*

*access to functions of the DW and access to a selection of codes*"), **wirelessly**

**sending** (Ludtke discloses in col. 5, lines 36-44 "*In one embodiment, the*

15    *transaction device may be configured to closely resemble a standard credit card.*

*More particularly, the card may have a magnetic stripe or a smart card chip that*

*functions similarly to standard credit cards. In addition, the transaction device*

*may contain wireless data communication, data storage and communication*

*protocols for selectively communicating with outside devices such as a digital*

20    *wallet described herein, point of sale (POS) terminal or personal computer (PC)*

*and digital televisions (DTV)*), **from the smartphone** (Ludtke describes in col. 9,

lines 39-42 that  "*A variety of communication devices may be used, such as the*

*Internet, direct dial-up modem connections, wireless or cellular signals, etc.*"),

**the ID code for comparison by the third-party trusted authority against**

**one or more previously registered ID codes** (Ludtke discloses in col. 6, lines

41-44 "The *transaction device information is provided to the TPCH 110 that then*

*indicates to the vendor 125 and the user 120 approval of the transaction to be*

5      *performed.*"  Therefore, the TPCH 110 includes information that can be

compared with information from the consumer and the consumer's device so

the TPCH 110 can determine whether the consumer 120 is authorized to

complete a transaction with vendor 125) **maintained by the third-party**

**trusted authority** (Ludtke describes in col. 6, lines 49-55 "The *TPCH 110*

10     *maintains a secure database of transaction device information and user*

*information. In one embodiment, the TPCH 110 interfaces to at least one financial*

*processing system 140 to perform associated financial transactions, such as*

*confirming sufficient funds to perform the transaction, and transfers to the*

*vendor 125 the fees required to complete the transaction*"), **a transaction being**

15     **completed responsive to the third-party trusted authority successfully**

**authenticating the ID code** (Ludtke teaches in col. 6, lines 41-44 "The

*transaction device information is provided to the TPCH 110 that then indicates to*

*the vendor 125 and the user 120 approval of the transaction to be performed*"),

**wherein the transaction being completed includes accessing one or more**

20     **from a group consisting of a casino machine, a keyless lock, an ATM**

**machine, a web site, a file and a financial account** (Ludtke describes in col.

5, lines 65- col. 6, line 4 "*A variety of user interfaces may be used. In one*

*embodiment, an input device may be incorporated on the transaction device.*

*Alternately or supplementally an input device may be coupled to the transaction device. In one embodiment, an input device may be provided on a digital wallet coupled to a privacy card. User inputs may be provided on the POS terminals including a personal POS terminal.*" Since Ludtke describes the transaction

5   device as including "a digital wallet", a POSITA would recognize as files that allow a user to digitally store credit card and other payment information and to make transactions with that card. Moreover, a POSITA would recognize that giving access to the digital wallet is providing access to a financial account) as called for in claim 1.

10         Scott is used as secondary reference to teach unique device ID (a unique ID code that identifies the PID 6) and storage of secret information (memory 20 stores information).

        Thus, Ludtke in view of Scott therefore provides a new technical teachings that were not present during the original prosecution, and a

15   reasonable Examiner would have found Ludtke in view of Scott important in considering the patentability of claim 1.  As SNQ is raised.

        The teachings of Ludtke in view of Scott as discussed in the Request are not cumulative to any written discussion on the record of the teachings of the prior art, were not previously considered nor addressed during a prior

20   examination, and the same questions were not the subject of a final holding of invalidity in the Federal Courts.

Control Number: 90/015,054                                                      Page 25
Art Unit: 3992

In regard to Patent claims 5 and 7, these claims contain similar limitation as claim 1. Thus, Examiner concludes Ludtke in view of Scott raise an SNQ for Patent Claims 5 and 7 in the same manner as for Patent Claim 1.

In regard to Patent Claims 2-4 and 6, 8-9 such claims are dependent on
5   Patent Claims 1, 5, and 7. Furthermore, dependent claims 2-4, 6 and 8-9 are construed to include all the limitations of the independent claims 1, 5 and 7. Thus, Examiner concludes Ludtke in view of Scott raise an SNQ for Patent Claims 2-4, 6 and 8-9 in the same manner as for Patent Claims 1, 5 and 7.

More particularly, the item matching in pages 69-85 offered by the
10  Request is deemed plausible to the degree that further consideration is warranted.

## SCOPE OF REEXAMINATION

On the basis of the findings above, Examiner agrees that Grounds 1-2 raise SNQs for claims 1-9 of the '989 Patent. Accordingly, claims 1-9 of the
15  '989 Patent will be reexamined as requested in this reexamination proceeding.

## 35 USC 325(d)

A review of the post grant history for the '989 Patent indicates that a
20  single AIA post grant challenge has been filed. On August 26, 2021, SAMSUNG ELECTRONICS AMERICA, INC. filed a petition for *inter partes* review (IPR2021-01448) asserting an RLP of claims 1-9 of the '989 Patent. The petition asserted

that claims 1-9 were unpatentable under 103(a) over Scott and Lapsley

(Ground #1) and unpatentable under 103(a) over Berardi, Shreve and Kinoshita

(Ground #2). On February, 28, 2022, the Board issued a decision denying the

petition as not raising an RLP to any of the challenged claims. In the Board's

5   decision refusion to institute *inter partes* review, regarding Ground #1, the

Board held that "Petitioner does not show persuasively that either Scott or

Lapsley teaches a "third-party trusted authority," as recited in claim 1…"

(IPR2021-01448, page 26). Regarding Ground #2, the Board held that the

petitioner had not shown sufficiently that Scott and Lapsley taught "receiving,

10   at a smartphone, an identification (ID) code from a third-party trusted

authority," as recited in claim limitation 1A. (IPR2021-01448, page 21).

A review of the AIA petition as compared to the instant request for *ex*

*parte* reexamination indicates that even though Scott was used in the prior AIA

AIA petition, it is now being used a secondary reference with the newly

15   presented Luedtke prior art reference (See proposed SNQ #2). Further, the

request specifically cites Ludtke to address the omission identified as the basis

for the Board's refusal to institute IPR2021-01448. As pointed out by third

party requester, Ludtke specifically discloses a transaction processing [or

privacy] clearing house (TCPH) which is a third-party trusted authority, and

20   further discloses that the TPCH "may access relevant account information to

authorize transactions." See Col. 3:40-45. Additionally, Figure 1 of Ludtke

shows how the TPCH is a third party. Thus, the teachings cited to in Lutke and

arguments related to Lutke presented in the instant reexamination request

Control Number: 90/015,054                                                                     Page 27
Art Unit: 3992

were not present in the prior AIA petition. Accordingly, the prior art and

arguments provided in the request are not the same or substantially the same

as those presented IPR2021-01448.

5      Accordingly, in view of the above facts, particularly the fact that the

request is not based on substantially the same prior art or arguments, a

discretionary denial of reexamination pursuant to 35 USC 325(d) is not

implicated and reexamination will be Ordered for the reasons set forth above.


## DUTY TO DISCLOSE

10     The Patent Owner is reminded of the continuing responsibility under 37

C.F.R. §1.565(a) to apprise the Office of any litigation activity, or other prior or

concurrent proceeding, throughout the course of this reexamination proceeding

involving the '989 Patent.  The Third-Party Requester is also reminded of the

ability to similarly apprise the Office of any such activity or proceeding

15     throughout the course of this reexamination proceeding. See MPEP §§2207,

2282 and 2286.


## SERVICE OF PAPERS

After the filing of a request for reexamination by a Third Party Requester,

20     any document filed by either the Patent Owner or the Third Party Requester

must be served on the other party (or parties where two or more third party

requester proceedings are merged) in the reexamination proceeding in the

manner provided in 37 CFR 1.248 (See 37 CFR 1.550).

Control Number: 90/015,054                                                                  Page 28
Art Unit: 3992

## EXTENSIONS OF TIME

Extensions of time under 37 C.F.R. §1.136(a) will not be permitted in

these proceedings because the provisions of 37 C.F.R. §1.136 apply only to "an

5 applicant" and not to parties in a reexamination proceeding.  Additionally, 35

U.S.C. §305 requires that reexamination proceedings "will be conducted with

special dispatch" (37 C.F.R. §1.550(a)).  Extension of time in reexamination

proceedings are provided for in 37 C.F.R. §1.550(c).  After the filing of a request

for reexamination by the Third Party Requester, any document filed by either

10 the Patent Owner or the Third Party Requester must be served on the other

party (or parties where two or more third-party-requester proceedings are

merged) in the reexamination proceeding in the manner provided in 37 C.F.R.

§1.248. See 37 C.F.R. §1.550(f).


15 ## CONCLUSION

Reexamination of Claims 1-9 are ordered herein.


All correspondence relating to this ex parte reexamination proceeding

should be directed as follows:

20 <u>By EFS</u>:

Registered users may submit via the electronic filing system, EFS-Web,

at: https://efs.uspto.gov/efile/myportal/efs-registered

<u>By U.S. Postal Service Mail to</u>:

Control Number: 90/015,054                                                                            Page 29
Art Unit: 3992

Mail Stop Ex Parte Reexam
ATTN: Central Reexamination Unit
Commissioner for Patents
U.S. Patent & Trademark Office
5       P.O. Box 1450
Alexandria, VA 22313-1450
Alexandria, VA 22314

For EFS-Web transmissions, 37 CFR 1.8(a)(1) (i)(C) and (ii) states that

10   correspondence (except for a request for reexamination and a corrected or

replacement request for reexamination) will be considered timely filed if: (a) it is

transmitted via the Office's electronic filing system in accordance with 37

CFR 1.6(a)(4); and, (b) includes a certificate of transmission for each piece of

correspondence stating the date of transmission, which is prior to the

15   expiration of the set period of time in the Office action.

Any inquiry concerning this communication or earlier communications

from the Reexamination Legal Advisor or Examiner, or as to the status of this

proceeding, should be directed to the Central Reexamination Unit at telephone

number (571) 272-7705.

20       Telephone Numbers for reexamination inquiries:

Reexamination and Amendment Practice      (571) 272-7703
Central Reexam Unit (CRU)                 (571) 272-7705
Reexamination Facsimile Transmission No.  (571) 273-9900

25   <u>Signed</u>:

/MY TRANG TON/
Primary Examiner, Art Unit 3992

30   <u>Conferees</u>:

Control Number: 90/015,054                                                                 Page 30
Art Unit: 3992


/KENNETH WHITTINGTON/
Primary Examiner, Art Unit 3992

5    /ANDREW J. FISCHER/
     Supervisory Patent Reexamination Specialist, Art Unit 3992